Good morning, Your Honor. May it please the Court, Daniel Winnick for the Federal Government. I'd like to reserve four minutes for rebuttal. States generally want conditions on federal grants to be construed narrowly, but the plaintiff states here have urged the Court to adopt an onerous interpretation of the offset provision that isn't supported by its text and that the Treasury Department has repeatedly disavowed, and on that basis to affirm an injunction against any enforcement of this provision, not just the onerous interpretation that they have asked the Court to adopt. That would violate two basic constraints on the power of the federal courts. First is that the courts lack jurisdiction to entertain constitutional challenges to hypothetical statutes, statutes that don't actually exist, in this case a statute that bans states accepting these funds from cutting taxes. The second is that courts cannot hold a provision to be facially unconstitutional on the basis that one of its potential interpretations would be unconstitutional. Let me start with the question of jurisdiction. As the Sixth Circuit explained in the Ohio case recently, to establish jurisdiction to seek prospective relief against the enforcement of this condition, a state has to show what it is doing or what it imminently plans to do that it fears would be barred by an enforcement of the provision. And plaintiff's attempt to answer that question seems to be that they want to cut taxes, in at least Texas' case, as with many other states, they have cut taxes since accepting these funds. But they haven't explained how the provision prevents them from doing that, either by its plain terms or as interpreted by the Treasury Department. That's why the Sixth Circuit and the Eighth Circuit rejected essentially the same jurisdictional theories, again, as to this very provision. To respond briefly to an argument the states have made, this isn't a matter of conflating jurisdiction and the merits. The merits at issue here, as the states have presented it, is whether a condition that bans states accepting these funds from cutting taxes would be constitutional. And the reason there's no jurisdiction is that that question is purely hypothetical here, because that's not what this provision does. There's no such provision in this case. To start with the text of the provision, it would have been very easy for Congress to write this provision to say that if a state could spend these funds. But the text of the provision doesn't say that. It says a state can't use these funds to pay for a tax cut, to offset a tax cut. I mean, I, you know, Economics 101, money's fungible. How does this play out? It plays out... Use the funds. I mean, do you have to, because it's a very complicated situation to consider whether you're using the funds in the state to stay on one side of the, the good side of the statute? And it's not even clear whether it's expected tax revenue or actual tax revenue. And so how does a state assure that it's on the good side of the statute, and given the overriding principles that, you know, money's fungible anyway? So this is very hard to make sure that you're not running afoul. So we certainly agree, Your Honor, money's fungible, but it's exactly for that reason that we actually think the provision is in effect pretty straightforward. What it means is this. So any state that has a balanced budget requirement, as these states all do, as almost all states do, knows that when it cuts taxes in a way that reduces its revenue, it has to pay for that reduced revenue in one of two ways, just budget math, right? It has to increase the revenue in other ways. It can do that if it increases other taxes, it can do that if it has economic growth, or if its revenue is going to be lower, its spending also has to be lower. It has to lower its spending to match its reduced revenue. All this provision means is that when a state does that budget math, it can't rely on these funds to make those numbers add up. It has to be able to afford the tax cut. So is it expected or actual? So the statute, we agree, doesn't specify whether it's expected or actual. Isn't that an ambiguity then? So it is an ambiguity in the statute as to the way in which the provision will be operationalized, but that's not the sort of ambiguity that renders the provision unconstitutional. I mean, as an initial matter, the Pennhurst clear statement rule is never a basis to hold a funding condition unconstitutional. The only court that's ever said otherwise, the Court of Appeals, is the Eleventh Circuit in these cases, and the Sixth Circuit said exactly the opposite. The Sixth Circuit correctly recognized you can't hold a provision— It's already a circuit split, so we might be joining this, perhaps. I'm not foreshadowing. Yeah. So I'm happy to, and we should talk more about that issue, but let me make sure to answer Your The ambiguity could be a basis to hold a provision unconstitutional, why Congress spoke with the requisite clarity here. So the kind of clear statement that the Supreme Court was talking about in Pennhurst is that states have to have notice that something in a statute is actually a mandatory and enforceable condition on the use of funds. So in Pennhurst, there was a Bill of Rights provision in the statute in question, and the question was, is this actually a mandatory and enforceable condition, or is it merely hortatory? Does it merely encourage the states as to how they're going to spend the money? And the court looked at the statute and construed it, saying, we're going to apply a clear statement rule. They didn't have clear notice it was a mandatory and enforceable condition, so we construe it not to be mandatory and enforceable. Nobody doubts here that there's a mandatory and enforceable condition on the use of these funds. They can't use these funds to pay for a tax cut. It's absolutely true that the statute doesn't answer every question about how the condition is going to be operationalized, but the Supreme Court has made very clear, as far back as Bennett v. Kentucky Department of Education and as recently as Biden v. Missouri, that Congress doesn't have to answer in the statute every detail about the condition. So just to take Biden v. Missouri, which... So what if they... So can they use the funds to supplement the budget for the hospital, and then take money out of the hospital thing and say, we're going to use that money to make a tax cut, you know, use an intermediary third party, and does that run afoul of the third category, and just switch the money around so that you're going to put it in this particular bucket that you're allowed to use it for, and then you take money out of that bucket for the tax cut, or, you know, move the money around. Is that run afoul? It's unclear. If they wouldn't otherwise have state money to pay for the tax cut, then yes, that does run afoul of the condition, but not if their revenue is increased anyway. I mean, Texas... How do you tell? You know, obviously, you follow... We're about to say Texas has had extra revenue. How do you tell whether it's that money that's being used or it's other money, and how do you... How does the state make sure, because it seems to be a pretty big deal, to run afoul of this? So if they have increased revenue, then the provision by its plain terms isn't implicated. There's no reduction in revenue. And look, I understand... I mean, the state's argument here is essentially that one can dream up an interpretation in which someone might hold them, you know, might seek to claw back the funds if they spend it in that, but that's not the way Treasury's interpreted it. And look, if the Court thinks it's necessary to render this provision constitutional to say, no, no, it doesn't mean the broader thing, it doesn't mean the thing Treasury has never read it to mean, the Court can apply a limiting construction. The Court can essentially say this provision means what Treasury has said it means. It means that you can cut taxes as long as you have state money to pay for that, as long as your revenue isn't reduced, or if your revenue is reduced, as long as you cut state spending outside the areas where you're spending these funds. And I just want to make sure... Run afoul of Pennhurst. I'm sorry? Run afoul of Pennhurst to do that, because you're... For the reasons we've been talking about. Yeah, no, so let me actually turn to the point I was going to make about Pennhurst, which is, look at Biden vs. Missouri. So the statute there authorized HHS to impose conditions on the receipt of Medicare and Medicaid funds that, quote, the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services. The plaintiffs in that case, including one of the plaintiffs here, said at the Supreme Court, this statute cannot be read to authorize the vaccine requirement at issue in that case, because we wouldn't have had notice of that from the statute itself. The statute itself doesn't say anything about vaccines. The Supreme Court disagreed. It specifically rejected the argument that the seemingly broad statutory language authorizes the Department to impose no more than a list of bureaucratic rules. This is consistent with all of the Supreme Court's Pennhurst cases. Go back to Bennett vs. Kentucky Department of Education. The Court has recognized that if the statute specifies a condition, Congress can delegate authority to an agency, as it does in lots of areas, to flesh out the particulars of how the in the context of funding conditions that says Congress has to put every detail into the statute. What it has to make clear under Pennhurst is simply that this thing in the statute is actually a mandatory and enforceable condition on the use of funds, as opposed to merely hortatory. And that's how the Court has applied the rule. I mean, as to... I have one more question, and then I'm going to be quiet so you can get back to your main argument and other people can ask questions. And I hate to bring it up, but nobody talks about severability here. There's no severability provision. Is severability an issue in this case? And if not, why not? It's kind of similar to your limiting principle, but not exactly at all. You're trying to accomplish partway, but it's not. So, I mean, I guess... I don't mean to ask a question back, but the question sort of depends on what we're talking about severing, right? We have not argued that if the whole offset provision is held unconstitutional, that the entire grant of funds falls. Does it matter that we do not have to deal with that at this phase? I'm sorry, does it matter... Do we have to deal with that at this phase, whether or not there's some limit, you know, severability? I mean, nobody suggested... Nobody suggested it. That's why I'm asking, why is it not here at this phase? And it could be that it's just obviously not here at this phase. And if you could explain that to me, I would appreciate it. And if you don't know, don't worry about it. I mean, the severability inquiry, Your Honor, is whether Congress would have, you know, meant to enact... I've really written a lot about it. So, right. So, I think everybody agrees that if this provision were to fall, if the offset provision were to fall, Congress would have meant to give the states the money anyway. There's a sort of... They agreed that. Yes, there's a narrower... So, we would just sever out the offset provision. If you were to hold... That's the answer. If you were to hold... The states aren't trying to invalidate all of ARPA. And they're only trying to do this provision, and this is the provision that would go, and nobody's going to... You're not going to... The government is not arguing that we, if we don't have this, then... No, that all of the $200 billion comes back. No, that's not American. Okay. You're not trying to... Nobody's trying to go there, that's why. Correct, yes. Question. Yes. Yes. The states want the money, they just don't want to be limited on their tax discretion. That's correct, yes. And the federal government's not saying it's one or the other, unless... If that part's gone. Can I go back to your earlier discussion about Biden and your principle that you can have clear notice, not just on statutes, but also regulations? Pardon my ignorance, I should know this. The treasury regs that were at issue, were those finalized before or after the states took the money? The interim final rule was before, the final rule, which is substantively the same as to the offset provision, was after. Yes. And to be clear, our position is not that the regulations can sort of cure a fatal ambiguity in the statute. It's that you don't have to have... The statute doesn't... Isn't ambiguous in an unconstitutional way. It doesn't have to spell out every detail, precisely because in this area, as in others, Congress can delegate to an agency, and it did here delegate to an agency, the authority to specify the particulars of how... I assume you would agree that you have to... For states to be on notice of their obligations not to cut taxes in a particular way, or else put their funds at risk, they need to know what the calculations they're supposed to be doing are. They need to know the baseline. Yeah, I mean... And Congress didn't provide that in the statute. You're saying treasury provided it in a regulation. And so if treasury were to seek to recoup funds, yes, a state could argue in defense of a recoupment proceeding, you know, we didn't have notice of what we were supposed to do. And in that context, I agree it would be relevant whether, you know, the regulations provided them with all of the details that they might not have known from the statute. Yes. But the challenge here is to the statute, and the statute cannot be held unconstitutional on the ground that it didn't supply all these details. And that's both because Congress spoke with the sort of clarity that Pennhurst requires, and again, more fundamentally, because the Pennhurst clarity requirement is simply not a ground on which a statute can be unconstitutional. And I could just say five seconds more on that. I mean, look at the Supreme Court's Pennhurst cases. Look at Arlington Central, for example, where the court considered the IDEA fee-shifting provision and decided whether it allowed the expert fees or just attorney's fees. If the states were right that a statute is facially unconstitutional if it doesn't speak with clarity, that statute would have been facially unconstitutional. The court wouldn't have said, no, no, it means attorney's fees, not expert fees. It would have said, boy, the courts have disagreed on this, the statute must be ambiguous, therefore the whole thing falls. You can't use it for attorney's fees either. So that's just not how courts, until the Eleventh Circuit's decision in West Virginia, that's just not how courts have ever applied the Pennhurst clear statement rule. We've talked a lot about ambiguity. I want to spend at least a minute on coercion. Yes, I was about to go there. That's what the district court did. Just hypothetically, I assume the government would agree that at sort of the most extreme outer bounds, there is a dollar amount that the Federal Government could take away from the states, take away from the citizens, and then spit it back to those states, but only if they agree to all these conditions. Surely there is some massive amount that you would agree would be coercive, right? No, Your Honor, if we're talking about conditions on the use of the Federal funds. And that's the bright line this Court has drawn and the Supreme Court has drawn. So this Court did in Groover. The Supreme Court, I think, did in NFIB. They distinguish between conditions on the use of Federal funds, which are flatly not coercive, no matter how much money we're talking about, and conditions that try to leverage Let me give you an ostentatious example, admittedly ostentatious, at least hopefully ostentatious. The Federal Government imposes a 100 percent tax, 100 percent tax on all income, and then gives it back. We're going to give it to the states because we want every state in the Union to provide cradle-grave services of all kinds. I mean, the states would not be required to take that money? Whether they might, as a practical matter, be required to take that money, it isn't coercive because it's a condition on the use of Federal funds. There might be other problems with it, but it doesn't run afoul of the coercion doctrine. And the Supreme Court has said this Just as a practical matter, I appreciate the doctrine. This case has not been presented, so we're not going to have case law on this one way or the other. Fair enough. Why would that not be the most absurd Federal structure known to mankind? We are taking all of your money, all income, and redistributing it through the state governments. The states would not be forced to take that? Their states would be impoverished. They would have no food. I agree that as a practical matter they might be forced to take it, but the question is I appreciate that statement because I think it's just a common sense statement. If they're forced to take it, isn't that coercion? No, Your Honor. The way the Supreme Court has articulated coercion doctrine is that Congress can't use its spending power to impose on the states conditions that go beyond the use of the Federal funds. So the Supreme Court said this in NFIB. The reason the Court in South Dakota v. Dole adopted it I appreciate this is a due fact matter. Yeah. Is that it's not a It's not coercive as the case law to date has explained, but I think you've said as a practical matter no state's going to let its citizens starve. I agree that as a practical matter in that case a state's going to take the funds, but that just isn't what coercion doctrine as it has been articulated by the Supreme Court speaks to. It speaks to the leveraging of the spending power to affect policy beyond the use of the funds in question. Counsel, can I ask you one question? Of course, Your Honor. So are you familiar with the mechanics of how the states in our circuit budget? Probably not. So, I mean, have you ever read one of the Appropriations Acts passed by one of the three legislatures in our circuit? I have not. So let's just talk about the biggest one, Texas. In Texas we have a biannual legislature. At the very beginning of the legislature they pass a General Appropriations Act. It's largely controlled at least at its inception and most of it's sort of pushing through of the legislature by the Legislative Budget Board, which is a state agency. And if you read, if you pull up a General Appropriations Act, it has what's called a bill pattern, that is each GAA is premised on the one that came before. And if you look at it and you go to the Health and Human Services Commission, it'll have the previous biennium in column one. It'll have the current biennium in column two. It'll have little delta numbers so that you can understand sort of what's changing. And then underneath of it, it's got little explanations about what this much goes to, you know, foster care and this much goes to hospitals and this much goes to Medicaid and et cetera. So what I'm trying to understand, and I'm just assuming for the sake of discussion that I'm with you that somehow the regulation can save the ambiguity or the compulsion or whatever, imagine that the case was actually filed, that the states took the money after the regulation was promulgated and the states were in fact challenging the regulation, right, to make it as clean as possible. When the regulation says if the state were to cut its spending of state funds in a department, agency or authority in which it is using fiscal recovery funds, right, so I've read lots of these General Appropriations Acts, and when I look at them, you can go to the Health and Human Services and it'll say $2.2 billion last biennium, $2.175 billion current biennium. They almost always have some delta to them, almost always. Is the state of Texas exposed to an audit by Secretary Yellen? So simple question, yes or no. I want to make sure I understand. I'm not trying to be difficult. What the regulations say is that if you have a reduction in revenue, if your revenue is below the pre-pandemic baseline, you can use a spending cut in a department where you're not spending these funds to permissibly pay for the tax cut. So it's not that you're sort of exposed to liability if you cut your spending. I understand, but so Health and Human Services, that's, the Health and Human Services Commission is the one that is responsible for the hospitals in the state of Texas. They're clearly using these funds. I haven't gone back to confirm that, but I would assume that that would be the principal use of these funds. If they just cut the spending, right, and obviously there's going to be tax cuts. The state of Texas passes tax cuts that are more than de minimis every single biennium. Maybe they are, maybe they're not within this particular department. But the way I read the regulation is that if there's a cut in spending and there's more than a de minimis cut in taxes, you're exposed to an audit. Am I misunderstanding? You are, Your Honor. That is not the case as long as their revenue is increased. What the rule says is if your revenue is higher than the pre-pandemic baseline, even after the tax cuts, this provision isn't implicated at all. Revenue statewide? Yes, if your overall revenue. And again, it's not that you're sort of in trouble if you cut your spending. The point is, if your revenue were reduced and you cut your spending, you couldn't use that spending cut to say, well, this is how I'm paying for a tax cut. So as long as the state is in the black as a as a state. Correct. Relative to this doesn't do anything relative to the pre-pandemic baseline. If their revenue is increased, then this provision is not implicated. That's why Treasury has not brought a single recoupment action under this provision, even though, as I understand it, and I'll grant this is outside the record, something like two thirds of states have cut taxes since taking this money. But if the state revenue goes down by even a dollar for the pre-pandemic baseline, state revenue total global wide, then you can't make reductions within any agency that is receiving the fiscal recovery funds. No, Your Honor, the thing that this provision forbids is not the reduction of spending. It's the use of these funds to pay for tax cuts. So if your reduction, if your revenue is reduced below the pandemic baseline, if your revenue is, say, a dollar below the pre-pandemic baseline, then you would be on the hook to return a dollar of these funds if you had cut taxes, unless you could show that you had cut your spending outside an area where you were using fiscal recovery funds. So I understand they're spending these these funds in the health area. Maybe they were planning to build a football stadium with one hundred million dollars in state funds, and they say we're going to save that state money. We're going to use that same money to pay for tax cut. Then there's no problem. In any case, the violative act is not the spending cut. The violative act is cutting taxes in a way you cannot afford with your own money. Thank you. I'm going to give Mr. Wilson an extra two minutes in light of the extended colloquy. May it please the court. The COVID-19 pandemic hammered state budgets, but ARPA, the law that Congress passed to provide states relief, prevented them from directly or indirectly reducing net tax revenue. That is because money is fungible cutting taxes. That mandate is unprecedented as the 11th Circuit recognized and unconstitutional and the states have standing to challenge it. I'd like to start, my friend on the other side said that what they're doing is not sort of conflating with the merits and standing. I think that's exactly wrong. Their brief, as I understand it, is looking to the Treasury regulations saying if you apply the regulations, there's no violation and so there's no standing. Standing is canonically determined at the time the complaint is filed. Standing also canonically, take for example FECB Cruz from the Supreme Court just last term, assumes in general the correctness of the plaintiff's legal duty for determining standing. What they're basically doing is saying, well, we've got a contract and your damages are zero so there's no standing and that's just as a general proposition not how standing works. We have standing in at least three ways. First, because the state was subject to an unconstitutional offer, the states were subject to an unconstitutional offer that continues to harm them. Second, because that impinges on the state's sovereignty. And third, the sovereignty to cut taxes. And third, because if this is viewed as sort of a pre-enforcement challenge, the states easily meet the standards set forth by Susan B. Anthony List and that this Court has articulated for example in speech first v. Fenves. When we filed the complaint, the states had an intention to cut taxes. The record reflects that some of the states did cut taxes. It postdates the filing of the complaint and indeed the briefing in this case, but it's a matter of public record that the Texas legislature has several bills that would be large property tax cuts this year. There's a threat of future enforcement and this is sort of all covered by a constitution aspect. So I think we have pre-enforcement standing there. I think what they're really arguing sounds in mootness, though I think the brief uses the word justiciability, but I think it's really a mootness argument because it's really saying that the regulations cleaned this up sufficiently, that there's no standing. It's wrong for several reasons. First, in the Texas Education Agency case, this Court made clear that the regulations don't, that regulations can't remedy a spending clause problem. And the 11th Circuit in the West Virginia case cited its own precedent, but also this Court's precedent reaching that conclusion. Should we decide this case on, if we were to decide this case, on coercion or ambiguity? I think the district court decided on coercion. And the 11th Circuit, to which you've just alluded, decided on coercion. No, that's right, Your Honor. The 11th Circuit called it ascertainability, which we've called ambiguity, but I think it's the same idea. I think it's most straightforwardly a coercion case because I think our read of the statute is right. I think the idea that you cannot directly or indirectly reduce net tax revenue, which against a baseline that we don't quite understand, I think that, I think that coerces the states because it implicates the states on money. All right, because it's ambiguous, it's coercive? No, no, no, Your Honor, because, because I think the, well, I think I mixed two concepts up just a little bit there. I think, I think our read of the statute is correct in that this, this prohibits tax cuts using the state's own money because money is fungible. Should the court think it's ambiguous? And I think my friend on the other side's reference to the constitutional avoidance canon is actually something in the nature of a confession because courts can only use the constitutional avoidance canon in the presence of an ambiguous statute in the first instance. Then it's an ambiguity case. I, I think the most straightforward way to decide it is the coercion analysis because I think our read on the statute is right. If the court thinks that the statute is ambiguous, then I think it could still be a coercion case if it falls into the other category more easily. You opened with saying that this is an unprecedented provision, and so let me just sort of test that. How is this different from maintenance of effort provisions that are, of course, ubiquitous in federal law? Sure, that's exactly right. Um, the, I think, I think it's fair to say that Congress knows how to write a maintenance of effort provision. The maintenance of effort. Isn't that what this is essentially? Is, is, you know, provide the same level of services. Don't just take this money and reduce taxes. Absolutely, absolutely not. I don't think it's provide the same level of services, um, because if, if Congress had wanted to say that, it could have simply said, you know, in category X or category Y, you must appropriate the same amount of money, something like that. That would have left the states, um, or, or frozen eligibility for certain areas, which is for certain programs, which is what they're, the cases that they're citing do. Um, this is very, I think this is very different and much broader and doesn't look sort of like a classic maintenance of effort provision. So I don't, I don't, I don't think it's that kind of case. The 11th Circuit. I don't mean to say it's literally maintenance of effort, but it is, it is conceptually similar perhaps in that the federal government's not trying to tell you how to spend other dollars. They just want to make sure that these dollars are spent on government services and not on reducing tax rates. I don't think... It's really a theory, right? It's not, it's not affecting a single dollar of, of current spending. It's just this, we want you to use to, we want you to use federal dollars this way, not that way. Um, I agree that's their theory. Um, what I would say is I think that's mostly, mostly accomplished by 802C1, which is the, uh, part of the statute that, uh, lists A through D. Um, I'm sorry, I might have the, I might have the citation wrong, but there's the, um, portion of the statute that lists... C1 rather than C2A. Right. That lists one, two, three, four, what you can do with the money. Um, you know, use it for interest infrastructure, use it for people affected by the pandemic, things like that. And I, I don't take us to be challenging that. Um, what's, what's different about the direct or indirect, um, provision is that we think it does implicate money that the, that the state raises. Because every, every dollar is fungible, um, and if they give us, you know, if they give us a million dollars or a billion dollars, it's actually several billion dollars for the state of Texas. In this case, um, because we have to balance our budget, that necessarily, um, involves money that the state raises as well. But this is the federal government giving you money you don't already have and just saying, use that extra money a certain way. I agree. You don't want it, then don't take it. I think that's what... Well, that's what I'm trying to isolate the coercive aspect of it. Um. My hypothetical earlier was it's such a massive gift, which maybe this is, that, uh, nobody would turn this down. I think that's, I think that's right, but I don't think that's sort of the end of our theory. I think it, I think it's certainly our argument that, um, this presented such, such massive dollar figures and such massive percentages of the state budget in a time in 2021, um, where states were experiencing significant revenue decreases that no one could turn it down. Um, I think the coercion point goes something beyond that though, because under Gruber, under Gruber, this court said basically there's money that the federal government provides you, um, and they put, and they attach conditions to that. And then there are the conditions like the, like the classic Dole condition that says, and you have to go do something else. Why doesn't this better resemble Dole than INFIB? Because it's only part of the money that you have to give back of the original money. It's not, it's not some penalty outside it, and it's only the proportion of the amount they give you that you have used to reduce taxes. It's not the whole amount of the gift that you're having. You know, the penalty is, it's not necessarily very large at all. It seems to be more, again, to Dole than INFIB. Help with that. Oh, sure. I see your honor. The point being that, um, you know, maybe if we cut taxes by a million dollars, we'd only have to give the million dollars back. And that's, that's not a, so what? That's not a, not a lot of money. Maybe it's not that coercive. Um, I would, I would make two points. First, as a matter of fact, the, at least the state of Texas, and I believe the record reflects the state of Mississippi as well, have cut and are considering very large tax cuts, um, thinking about it in these sort of pre-enforcement way. Um, second, I think part of what's, part of what's going on here is because we know that this is, that the provision, um, is very broad and can reach lots of money, um, there's a disincentive effect for these, for these states to cut taxes in the first instance. You know, absent the regulation, and I think still with the regulation, it's extremely difficult for us to determine sort of, you know, exactly what does direct or indirect mean, what is the baseline. The regulation says the baseline is 2019, um, but Congress actually put a 2019 inflation adjusted baseline in an adjacent part of the statute, and it's not in this part of the statute, which usually we would refer, usually we would take to infer as sort of, um, that's not the right baseline, because usually when Congress puts a provision somewhere in an adjacent part of the statute, we think it left it out on purpose. So this gets to the ambiguity argument. I think that's right, Your Honor. So is your point that, because it sounds to me that Treasury filled this in, and said we are using 2019 as the baseline, are you telling me that you didn't have notice of that, or that it's not legitimate to clarify it in a rec? Treasury filled that in. Our position is as a matter of this court's precedent, as a matter of law, Treasury can't, um, backfill a regulation in that way, or a law, that the spend, because the spending clause powers a power Congress has, it has to be in the statute. I'd point to the Texas Education Agency case from this court last year for that proposition. So opposing counsel cites Biden v. Missouri as rejecting that proposition. Do you want to respond? Sure, um, and I think this, I think the Biden v. Missouri point, uh, goes back to, well, first, I would say, you know, for the Supreme Court to, for this court to view the Supreme Court as having, as having cast serious doubt on its precedent, usually it has to be fairly clear, um, I don't, the Biden v. Missouri case was in something of a different context. Second, I think this goes back to the distinction in Groover, which is our money versus their money, um, that is to say, when the federal government gives you lots of money to run a medical system, they have, they have somewhat more leeway to, um, tell you how you're going to do it than once it starts, once it starts implicating the state's money as well. Okay, what's your straightforward argument that this is enough to be coercive and that this is not like Dole? What's the straightforward argument on that point? Um, that it's, the total is $15.8 billion for Texas, $3 billion for Louisiana, and $1.8 billion for Mississippi, which is 13.7 and 31% of the state's budgets. Right, but you only lose the amount of the, do you, that you've used, you know, you're going to subtract out what the, what you've gone over the tax cut. Right, Your Honor, and to, to finish the answer I was going to make, I think, I think, no, I think the, the point is that because these are massive numbers, because the states could not say no, as Judge Ho was suggesting, but also because there's a significant sort of chilling or interim effect as to what the states can, what the states can do when the legislature does not know how this is going to, um, when state legislatures don't know how this is going to play out and how much money is at issue. Why is it this, the moodish kind of point? Oh, I, oh, I, I don't agree that, I don't agree that we know, that we know, Your Honor. We don't know. He's saying he's, he's ready here to represent today and for us to write into the opinion that they're not going to go against you unless you go outside the parameters of the regulation. He's referring that to be, the statute itself, to be narrowed in that way. Your Honor, I would point to, I would point to 31 CFR 35.4a, which is part of the regulations, which essentially gives the secretary author, separate authority, sort of out, basically says nothing in the regulations shall be construed as giving, as preventing the secretary from having authority to sort of go after people who are evading the statute in one way or another. So I don't, I don't think it's, I don't, first, we don't think that the statute or the regulation can fix the problem, but second, I think they have significant additional authority in 35.4a to reach, you know, perhaps outside the exact scope of the, of the regulations. But to, to, I, I'm happy to talk more about mootness because I... Could you maybe give a sentence or two more, please, on the mootness? Sure. Um, several points. They're really not, they, they said justiciability, but I think it has to be mootness. The first point I would make is that the burdens on, the burdens on them to show mootness, and as a general proposition, they have to show that it's impossible for us to get, impossible for the states to get relief, or that there's just, there's just no relief to be had or no possibility of recurrence. I'd point to this court's opinion in Sossaman for that. I'd point to the Supreme Court's opinion in Friends of the Earth. Dear William B. Trump from last year, which made clear that, you know, a concrete interest, no matter how small, is enough to avoid, to avoid mootness. So I think that, you know, we, as I said before, we don't think the regulations can fix the constitutional problem under TEA, but even if, even if the court disagreed with that, you know, we have an injunction that in any event is significantly, is significantly broader than the, gives us significantly broader protection than the regulations do. Can you elaborate on that slightly, please? Oh, absolutely. The, the, well, the injunction, the injunction enjoins the application of the provision. There's, there's still plenty of circumstances under the regulation where the states could face a recoupment action. I mean, just for, just for example, you know, I think the states have, as a matter of fact in the world, I think the states have a fair amount of revenue right now, but if a recession, if a recession occurs and state revenue goes down, again, we'll be, we'll be right, we'll be right up against it immediately. We'll be right up against it again with the same problems and having to worry about the, these recoupment actions. So I, I just have troubles, I, we just strongly don't think that the case has moved. I would like to talk, I think I've mostly covered the merits. Maybe we should talk a little more about the ambiguity or sort of the un-ascertainability. That's how the 11th Circuit decided this case. You know, to, to sort, I think, I think the 11th Circuit was, I think the 11th Circuit opinion is extremely persuasive and I would commit it to the court. The basic problem that they identified was that this is just not, we can't ascertain how this all works and, you know, the Treasury regulations themselves are atextual in several respects. The Treasury regulation has a sort of 1% safe harbor. Well, that's, that's nowhere in the statute and in fact, the statute requires states to report all of their tax changes that reduce revenue. So I think there are some strong textual clues that that actually doesn't even comport with the statute. The baseline, again, just seems sort of made up and because Congress put that baseline and the baseline Treasury identified in adjacent parts of the statute, there's, again, a strong textual clue that Congress didn't intend that to be here. And I would also say in the letter that we, and I would also say in the letter that we sent, that several state attorneys general sent to the Secretary of the Treasury and also in the Secretary of the Treasury's testimony before Congress, before the Senate Banking Committee, I think they said it was ambiguous absent the regulations and because the regulations can't fix the problem, at a minimum, I think we think this is ambiguous and un-ascertainable. So the regulations can't fix statutory ambiguity and invalid regulations certainly can't fix statutory ambiguity. That's correct, Your Honor. At least not in, at least not in this context. There may be, there may be other contexts where regulations could. I wouldn't want to speak to the entire universe, but certainly in the, the spending clause context, this Court held in. I'm sorry, I'm referring just to the spending context. Your point is regulations in the spending context can never provide the clarity necessary under Pennhurst, et cetera, and a four CRI invalid regulation. Yes, Your Honor, and that, and that as TEA says, and I think as Pennhurst and Dole say, those aren't just rules of construction. Those are, those are real requirements. I see I'm almost out of time. If the Court has, I think I got a couple of extra minutes, so if the Court doesn't. Do you want to talk about Ohio v. Yellen or Missouri v. Yellen? Oh, sure, Your Honor. Um, I think the, I would be happy to discuss both of those. The Missouri case, um, I think is both distinguishable and, uh, and we just disagree with it. It's distinguishable in the sense that, um, what Missouri did is offer sort of a broad and narrow reading of the statute and said, Court, please, please enjoin the broad reading of the statute. It's not what we're doing here. We're saying we think the statute itself, um, is unconstitutional in a variety of respects. Second, I think what the Court, what the Eighth Circuit did in the Missouri case is, um, what my friends on the other side are inviting this Court to do here that we just strongly disagree with, which is confuse the, um, standing question with the justiciability or mootness question, um, because the Eighth Circuit basically imported, um, the rule and said, well, there was no, there was no standing because of the rule. Um, as I said earlier, we just think, we just think that's wrong because standing is canonically determined at the time of the complaint. Some of the amici seem to be taking the position that the Court could say, this is just too poor to tax state taxation policy, and that that in itself is a reason enough to invalidate this, you know. Um, is that already foreclosed by the Supreme Court, though, that would require a change from the Supreme Court to adopt that broad, that broad understanding? It's, I mean, a number of amici basically said, well, it's about state tax policy, and you know, de Tocqueville would say the states need to be able to, to, to experiment and try different things, and, and, and this is interfering in that. And so, I'm just saying that's, it's, they're at that kind of broad level, and, and I think that I'm not sure that, that, that the Supreme Court hasn't already not, you know, gone to allow these certain tax policies. Your Honor, I think that it has, I think that it's much more straightforward if it that the Supreme Court has clearly articulated, whether that be commandeering or coercion, which are both sort of rooted in federalism and the important powers that states retain, or through the ambiguity or ascertainability rules from Pennhurst and Dole. So I, I wouldn't say that there is, there's no law, no law in the world where these sort of state tax, state tax power would not be so central. I don't think we have urged the court that that is the case in this matter. Okay. Thank you. Three quick points, one about jurisdiction, one about ambiguity, and one about coercion. On jurisdiction, they offer three theories of standing in their brief. Every one of them rests explicitly on the idea that this provision bars them from cutting taxes. It's now very clear that's not how Treasury interprets it. It's not how Treasury is going to enforce it. That defeats jurisdiction. Second, as to ambiguity, let me just address- Could Treasury change? Could the- Do we have to wait for Treasury to change to bring the case then? If, you know, it remains in the hands of Treasury how to interpret, it could change its interpretation. I mean, I suppose in theory, although we've represented to this court and to others that we think this interpretation follows from the plain text of the statute. And if you look at the regulation, Treasury is not saying, you know, gee, we could read this as a ban on tax cuts, but we're going to choose not to. I mean, I think regulation- Well, I mean, you say that, but we have a lot of statutes where the different agencies under different administrations come in and take vastly different approaches to what the statute means. And so, I mean, we're just going to both take your assurance for that, which is valuable, and I'm not belittling that in any way. Yeah, I mean, what I'm trying to do is distinguish this from a case where the statute is sort of genuinely amenable to being read in multiple ways and the agency is picking one. I think that both our position and the regulations are pretty clear that we see this interpretation as following from the plain text of the statute. As to- I know you've got two other points, and I promise you I'm going to let you make them. How does this deal with the idea that what if you were running a deficit and you thought that the best thing to do would be to cut taxes to generate more revenue in the future? You know, somehow you believe in the Laffer Curve or something, just a blast from the past, I guess. But what could you- could you have that freedom, or would there be intense scrutiny because you're running this deficit? Well, I mean, to take the Laffer Curve point, you know, under the regulations, if a state reasonably projects that a reduction in tax rates is going to increase its revenue- We have no idea, but we're just in such a bad ditch, we've got to try every possible thing. No, no, no, but they- I mean, they have to make some sort of projection, and if they think it's actually going to increase their revenue, then there's no problem. If they do think it's going to reduce their revenue and they couldn't afford to do that without this federal money, then that's not a choice open to them. That's a string that Congress can put on this. So what if a state says, I am absolutely not doing this because of ARPA, and the federal government, the secretary says, of course you're doing this because of ARPA, who decides? Well, it's- I think it's not sort of a discretionary choice. If they couldn't afford to do it but for these funds, then it's in violation- then the tax cuts- State says we absolutely could have afforded it, we're doing it for other reasons, and the federal government just specifically disagrees. Who decides that? If they can afford to do it with state money, if they have enough state revenue that they can cut taxes, and either they're winding up with- Somebody has to resolve the dispute, right? There's just a disagreement. State says this has nothing to do with ARPA, federal government says of course it's because of ARPA. Well, I guess it's- it's not a dispute as to motive, it's a- to the extent there's a dispute as to whether there is state money, I mean, I think it's fairly black and white just sort of on the budget map. Either they have revenue such that they can afford to cut their taxes and not wind up with reduced revenue, or they don't. Who decides that? Treasury in the course of bringing a recoupment proceeding, which of course they could challenge in court as with any other agency actually. How does the state have fair notice as to how the secretary is going to resolve that dispute? I mean, the regulations lay out- I'm not aware of any way you could have sort of ambiguity about how the regulations are going to apply just sort of in terms of how the budget map works. I think the regulations make pretty clear what Treasury thinks and how it's going to apply the provision. And again, if the state were to, you know, challenge a recoupment action, a court would have- would be able to review that. I realize I'm- I'm going to let you ask the- you still can tell your two points. In other words, your view is this is just applying a mathematical formula. There's no, you know, either one plus one equals two or it doesn't, right? Yes, under the regulations. I guess what I'm wondering is, and I'm going to think carefully about this obviously in the coming weeks, but is that really how this provision works? It's just obvious that there was a direct or indirect connection between the reduction and the ARPA funds? Or could that actually be quite hotly debated by very senior officials in both state and federal governments in good faith? It is not, Your Honor, a matter of causal nexus. It's not a matter of motive. What it is a matter of is if you have state money so that you can afford the tax cut without needing to use these funds, these federal funds to make your budget add up, then the offset provision is not implicated. If, by contrast, you could not cut taxes, but for using these funds to balance your taxes and you couldn't afford to do it, you're using these funds in that way. I guess the image I have is, I'm sorry to butcher this metaphor, if you, you know, it's like pouring water into the ocean, right? How do you know? I guess I'm just repeating the fungibility point. I could see genuine debates about whether this is offsetting that or something else. So, Your Honor, as I understand the sort of the clearest distillation of the fungibility point, it's this. So suppose counterfactually you have reduced state revenue. And suppose you then, you know, you say we're going to cut taxes by $100 million. We're going to choose not to build the $100 million football stadium we were going to use the state money for. Then, you know, should we worry that Treasury is going to say, well, you didn't use the saved $100 million in the football stadium. You used these state funds. And to that, I would say, I mean, first, as a matter of plain text, if there's no, you know, difference between the state revenue and the state expenditures, if there's no, if there's nothing to offset, then they haven't used these federal funds. There are going to be easy fact patterns, like obviously a perfect offset to some football thing. But you're going to have other situations where, look, you know, we're doing well right now economically. We want to cut taxes because it's a citizen's money. One side's going to say, well, you're only doing this because ARPA. And the other side can say, no, we're doing this because we believe in the Texas miracle and we have great revenue here because businesses come here. Who decides? Isn't that a genuine fact dispute amongst people in good faith? And I'm saying, Your Honor, either under the statute or under the regs, there's no sort of issue of nexus or motive. The analysis is not. What's an offset? Is an offset by definition is you're crediting one thing to something else. And my point is, isn't that something else going to be disputed? Or am I just missing the boat here? I don't think it is going to be disputed, Your Honor. I think that if you have state money that you can afford the tax cut, then you're not using these federal funds to offsetting it. And if you don't have state money to afford the tax cut, then you are. And I think that's just a matter of budget math. I don't think it's a matter of motive or anything like that. I guess just to put it less articulately than my colleague, I'm wondering, what if the state says, You know what? We want a smaller government. We're tired of this. We serve many services to everybody. And we're actually just going to next year, but we can't this year. We're going to try to cut tons of services and have a smaller government. So we're going to cut taxes. So this is the opposite, that they think it's going to generate more. They don't want to generate more revenue. It seems like that's a motive thing. But what if it doesn't work at all and they can't get the legislature to agree to cut services because everybody likes services once they get them? So then it seems like you are back in this, well, was it a good faith belief that you were going to cut your services and the fact that you weren't able to, and so they used this money to tide them over. I don't understand how you adjudicate these things and how the state could be sure that it wouldn't run afoul of this rule. I mean, Your Honor, if they were going to cut taxes and cut their own spending by cutting services. Right, but they haven't yet cut their spending. They're hoping to in the next session, which hasn't come yet. And they're just anticipating. I take the point. I think that in that scenario, if they didn't ultimately make the spending cuts, then yeah, they would have cut taxes in a way that they couldn't afford with their own money. Assuming they don't have. So then they're going to get it under this and have to give all that money back. Assuming they don't have the increased revenue that, you know, in the real world they all have. Isn't that a legitimate thing for a government to do? To try new things and to hope to do new things? And why is the federal government? How come it would apply in that circumstance? Because Congress has the constitutional authority to set conditions on the uses of funds that it appropriates. It's given the states a lot of money. It said you can't use this money to cut taxes if they use the money to cut taxes in a way that they can't. But are they using it to cut taxes or were they going to cut taxes anyway because they wanted to try their libertarian experiment? You know, you're going to have a fact here, evident you're hearing on the motivation. It seems like it's the motivation again. Again, Your Honor, I just don't think motive has anything to do with it. If they can't afford that tax cut, but for these federal funds, then they're using it in violation. What does it mean to afford the tax cut? It means that if they couldn't, as a matter of their balanced budget requirement, have sufficient money to pay for that tax cut without these federal funds. You said use these federal funds to tide them over. If they couldn't cut taxes without these federal funds, they're using the federal funds in violation of the condition. Now, this is again far, far from the real world. There's been no recoupment action under this because the states all have increased revenue. But in that scenario, yes, they'd be using these funds in violation of the condition. You had two points. Yes, and I'm sorry. Hoping to get to them very briefly. So first, just as to Texas Education Agency, it's consistent with our understanding of Pennhurst. It was a concrete dispute over the application of a funding condition. It also rests quite heavily on the nature of the condition there, which was a waiver of sovereign immunity. And the whole thing was that the agency couldn't create a condition not found in the statute, not that it couldn't flesh out particulars about how the condition is going to be applied. And then last, as to coercion, you heard them say they think the reason it's coercive is that it prevents them from using state money to pay for a tax cut. Even if that's a possible reading of the text, which I don't think it is, it's certainly not a required reading. And it would be extraordinary to say in the face of the textually and constitutionally sound reading Treasury has adopted, to adopt their extremely onerous interpretation and on that basis to hold an act of Congress facially unconstitutional would be extraordinary. Thank you. Thank you, Your Honor. We have your arguments. We appreciate both arguments in this case, and it is submitted. We're going to take a 10-minute recess.